UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERONIMO POLINA,<br><br>                     Petitioner,<br><br>v.<br><br>W.L. MONTGOMERY; KAMALA D. HARRIS,<br><br>                   Respondents. | Case No.:  16-cv-02133-WQH (RNB)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

This Report and Recommendation is submitted to the Honorable William Q. Hayes, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(d) of the United States District Court for the Southern District of California.

## PROCEEDINGS

On August 22, 2016, Petitioner Geronimo Polina ("Petitioner" or "Polina"), a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C.

§ 2254.  (ECF No. 1 ("Pet.")).[1]  The Petition was directed to convictions sustained in San Diego Superior Court, Case No. SCS245331, for conspiracy to commit murder, attempted murder, and assault by means likely to cause great bodily harm.

On January 3, 2017, Respondent W. L. Montgomery, Warden ("Respondent"), filed an Answer and Notice of Lodgment.  (ECF Nos. 15, 16.)  On February 2, 2017, Petitioner filed a Traverse.  (ECF No. 20 ("Trav.").)

Thus, this matter now is ready for decision.  For the reasons discussed hereafter, the Court **RECOMMENDS** that the Petition be **DENIED**.

## BACKGROUND

On January 27, 2011, the People of the State of California ("People") filed a felony complaint against Petitioner, and five other inmates, Jose Manuel Garcia ("Garcia"), Eduardo Alberto Macias ("Macias"), Juan Gabriel Morones ("Morones"), Lionel Alvidrez Quinteros ("Quinteros"), and Francisco Daniel Valencia ("Valencia"), in Superior Court of California, County of San Diego, South County Division, Case No. SCS245331.  (ECF No. 16-1 at 5-16; ECF No. 16-2 at 7.)

The complaint charged Petitioner with the following: (1) attempted murder, in violation of Penal Code[2] § 187(a) and Penal Code § 664 (Count 1); (2) conspiracy to commit murder (Penal Code § 187(a)), in violation of Penal Code § 182(a)(1) (Count 2); and (3) assault with a deadly weapon by a prisoner, in violation of Penal Code § 4501 (Count 4).  (ECF No. 16-1 at 5-16.)  For each of these felony counts, it was alleged that Petitioner committed the felonies "for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal

---

[1]     Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing ("ECF") system.

[2]     All references herein to the Penal Code refer to the California Penal Code.

2

conduct by gang members within the meaning of" Penal Code § 186.22(b)(1). (*Id*.) For Counts 1 and 4, it was further alleged that Petitioner "personally used a deadly and dangerous weapon, to wit: a knife or other sharpened instrument or object, within the meaning of" Penal Code § 12022(b)(1). (*Id*.) The complaint also alleged that pursuant to Penal Code §§ 667(b) through (i), 1170.12, and 668, the "Three Strikes Law," that Petitioner had suffered prior strikes in 1996 and 1999. (*Id.* at 13.)

Following the preliminary hearing held on March 21, 2011, the Honorable Charles G. Rogers held the defendants to answer to all charges, but dismissed the arming allegation under Penal Code § 12022(b)(1) against Petitioner. (ECF No. 16-1 at 50; ECF No. 16-2 at 7, 50-51; ECF No. 16-4 at 7-10.)

On October 6, 2011, the Motion to Sever of defendants Garcia and Morones was granted. (*Id*. at 8.)

On October 24, 2011, an Amended Information was filed against Petitioner, Garcia, Macias, Morones, Quinteros, and Valencia in Superior Court of California, County of San Diego. (ECF No. 16-1 at 37-48.) The Amended Information included the following three counts against Petitioner: (1) conspiracy to commit murder (Penal Code § 187(a)), in violation of Penal Code § 182(a)(1) (Count 1); (2) attempted murder, in violation of Penal Code § 187(a) and Penal Code § 664 (Count 2); and (3); assault with a deadly weapon by a prisoner, in violation of Penal Code § 4501 (Count 4). (*Id*.) For each of these felony counts, it was alleged that Petitioner committed the felonies "for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members within the meaning of " Penal Code § 186.22(b)(1). (*Id*.) For Counts 2 and 4, it was further alleged that Petitioner "personally used a deadly and dangerous weapon, to wit: a knife or other sharpened instrument or object, within the meaning of" Penal Code § 12022(b)(1).[3] (*Id*.) The

---

[3]     The Penal Code § 12022(b)(1) charges against Petitioner were stricken at the preliminary hearing. (*See* ECF No. 16-4 at 7-10.) Correspondingly, the assault with a

Amended Information also alleged that pursuant to Penal Code §§ 667(b) through (i), 1170.12, and 668, the "Three Strikes Law," that Petitioner had suffered prior strikes in 1996 and 1999. (*Id.* at 45-46.)

On or around January 23, 2012, the case was assigned to the Honorable Peter C. Deddeh for all purposes. (ECF No. 16-2 at 63.) The jury trial for Petitioner, and defendants Macias and Quinteros, commenced on or about December 5, 2012. (*Id.* at 8, 77.) Petitioner was represented by Frank V. Puglia. (*Id.*) On December 21, 2012, Petitioner and defendant Macias were convicted of Counts 1, 2, and 4 of the Amended Information. (*Id.* at 8, 105-10.) The jury further found that Petitioner and defendant Macias had committed the felonies "for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members within the meaning of" Penal Code § 186.22(b)(1). (*Id.*) Defendant Quinteros was convicted only of Count 4 of the Amended Information. (*Id.* at 8, 111-13.) The jury further found that Quinteros did not commit Count 4 for the benefit of, at the direction of, and in association with a criminal street gang within the meaning of Penal Code § 186.22(b)(1). (*Id.* at 113.)

Later, in a bifurcated proceeding, Petitioner admitted two of the three prior strike allegations, and the third strike allegation was dismissed. (ECF No. 16-14 at 3.) The Superior Court sentenced Petitioner to an aggregate prison term of 75 years to life plus 16 years. (*Id.*) The sentence consisted of an indeterminate term of 50 years to life for Petitioner's Count 1 conspiracy conviction, plus a consecutive indeterminate term of 25 years to life for his Count 2 attempted murder conviction, plus a consecutive determinate upper term of six years for his Count 4 aggravated assault conviction, plus a consecutive 10-year term for the Count 4 gang enhancement. (*Id.*) The Superior Court stayed under

---

deadly weapon charge in Count 4 was changed to assault by means likely to inflict great bodily injury by a prisoner under Penal Code § 4501(b). (*See* ECF No. 16-2 at 110; ECF No. 16-1 at 127-28.)

Penal Code § 654 the separate 10-year gang enhancements it imposed as to Counts 1 and 2. (*Id.*)

On June 18, 2014, Petitioner filed an appeal of the final judgment in the Court of Appeal. (ECF No. 16-12.) Petitioner raised five grounds for relief, including the following three claims being raised by Petitioner herein: (1) Petitioner's conspiracy conviction violated his due process rights under the Fourteenth Amendment and deprived him of a right to a fair trial because the conspiracy instructions did not require the jury to find that he personally participated in the conspiracy and personally harbored the specific intent to kill Ortiz; (2) the trial court abused its discretion and violated Petitioner's right to a fair and impartial jury under the Sixth and Fourteenth Amendments when it refused to declare a mistrial after Macias slashed his attorney's face with a razor in front of the jury; and (3) the trial court abused its discretion and violated Petitioner's right to a fair and impartial jury under the Sixth and Fourteenth Amendments when it refused to declare a mistrial after the jury observed Petitioner shackled two separate times following the courtroom assault by Macias. (*Id.*)

On March 19, 2015, the Court of Appeal affirmed the judgment of the Superior Court, with modifications. (ECF No. 16-14.) The judgment was modified to reduce the 10-year prison term imposed for the Count 4 gang enhancement to a five-year term under Penal Code § 186.22(b)(1)(B). (*Id.* at 56.) The judgment was also modified to stay under Penal Code § 654 the 25-year-to-life sentence the court imposed for Petitioner's Count 2 conviction of attempted murder, the six-year sentence imposed for Petitioner's Count 4 conviction of the substantive offense of assault with a deadly weapon by a prisoner, and the attendant Count 4 five-year gang enhancement. (*Id.* at 56-57.) The matter was remanded with directions that the Superior Court prepare an amended abstract of judgment to reflect the modifications. (*Id.* at 57.)

On April 20, 2015, Petitioner filed a Petition for Review in the Supreme Court of California. (ECF No. 16-15.) Petitioner raised the same three grounds for relief referenced above as he did in the Court of Appeal. (*Id.*)

On July 8, 2015, the California Supreme Court denied Petitioner's Petition for Review without comment or citation to authority. (ECF No. 16-16.)

## SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

The Court has independently reviewed the state court record. *See Nasby v. McDaniel*, 853 F.3d 1049, 1052-54 (9th Cir. 2017) (citing *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997)) (finding that "meaningful collateral review of the state court's adjudication of petitioner's claims requires an 'independent' assessment of the basis for the state court's decision"). Based on its independent review of the record, the Court adopts the following factual summary from the "Factual Background" section of the unpublished California Court of Appeal[4] opinion in *People v. Polina*, Case No. D064796 (Cal. Ct. App. Mar. 19, 2015) as a fair and accurate summary of the evidence presented at trial[5]:

A. *The People's Case*

Victoriano "Cyco" Ortiz testified both as the victim of the July 5, 2010 attack in the prison yard at the Richard J. Donovan Correctional Facility (hereafter Donavan or Donovan Prison) that is the subject of this case, and as an expert on the Mexican Mafia. Ortiz, who had been a member of the Brole gang in Brawley, California, became an associate[6] in the Mexican Mafia. He was incarcerated at Donovan after he was convicted in 2010 of committing an assault in El Centro for the benefit of the Mexican Mafia.

Ortiz indicated that the Mexican Mafia exerts its control inside California prisons and jails and over Southern California Hispanic street

---

[4]     All references herein to the Court of Appeal refer to the California Court of Appeal.

[5]     The Court notes that Petitioner does not contend the Court of Appeal's "Factual Background" is inaccurate in any respect. Moreover, Petitioner's factual summaries in his filings before the Court of Appeal and California Supreme Court are not inconsistent with the Court of Appeal's summary of the evidence presented at trial. (*See* ECF No. 16-12 at 14-23; ECF No. 16-15 at 14-19.)

[6]     Ortiz testified that an associate is somebody who has been "validated" and has "a lot of authority and power . . . for the Mexican Mafia."

gangs. Members of Hispanic street gangs in Southern California are called "Southsiders." The Mexican Mafia is in charge of the Southsiders. A "Sureño" is a full-fledged "soldier" who is very loyal to the Mexican Mafia. To become a Sureño one must assault somebody in prison or do something that shows his alliance with, and respect for, the Mexican Mafia.

Ortiz testified that the Mexican Mafia communicates to inmates through letters. These letters give inmates authority to "run" the prisons, collect "taxes," and "do whatever has to be done" inside the prisons. To show their respect to the Mexican Mafia, Southsiders must pay "taxes" to the Mexican Mafia in the amount of one-third of all of the proceeds of their illegal activity.

Ortiz also testified that if a street gang fails to pay their respects to the Mexican Mafia, they can get "greenlighted," which means the members of the gang will be beaten or stabbed when they arrive in prison depending on how "hard" the greenlight is. According to Ortiz, members of the Mexican Mafia commit "[a]ssaults, stabbings, shootings, kidnappings, torture, anything that they have to" in order to "get the point across that the Mexican Mafia is and will be respected." The members commit crimes to collect their money, often by extortion. In the prison, a module contains about 20 cells, and each module is run by a "key holder" who is in charge of collecting the taxes for the Mexican Mafia.

Ortiz testified that when he arrived at Donovan, he believed he had permission to run Donovan based on verbal and written authority that Mexican Mafia member Richard Buchanan gave him. Ortiz established a "mesa" (his team or executive committee) with three other Donovan inmates: [Petitioner] ("Blue"), Isaac ("Lazy") Ballesteros, and Manuel ("Stomper") Gonzalez. Before July 2, 2010, Macias (one of [Petitioner]'s codefendants at trial), a Sureño whom Ortiz knew as "Funny Boy," was also loyal to Ortiz. Ortiz testified that Quinteros ([Petitioner]'s other codefendant at trial), a Southsider whom Ortiz knew as "Chuco," wanted to become loyal to Ortiz's mesa and told Ortiz he would do whatever Ortiz asked.

According to Ortiz, a power struggle arose when another inmate, "Casper from Fallbrook,"[7] failed to recognize Ortiz's authority. In an attempt to "come together in agreement," Ortiz tried sending written "kites"[8] to Casper

---

[7] Pablo "Casper" Franco.

[8] Ortiz testified that "kites" (or "willas") are "small handwritten notes that [inmates] usually fold and roll up real small the size of a capsule. [U]sually an inmate can

indicating that Buchanan had given him authority to run the prison. Ortiz directed Ballesteros to write a kite telling Casper that he and Ortiz needed to "settle up," but Casper refused to do so.

On July 2, 2010, through a vent, Ortiz overheard a Mexican Mafia associate named Jose Manuel "Crazy Joe" Garcia, who sided with Casper, tell Ballesteros to stab or slice Ortiz and Gonzalez with razor blades. Ortiz testified that he also read some kites sent to Ballesteros stating that Crazy Joe (Garcia) said Ortiz and Stomper (Gonzalez) were supposed to get "hit on the next available yard, no exceptions." These kites noted that Ortiz, [Petitioner], Ballesteros, and Gonzalez were "in the hat," which meant they had "mess[ed] up" and were "done." The word "whacked," which means killed, was used in one of the kites. Ortiz testified he was angry that Ballesteros, a member of his mesa, was being ordered to stab him.

Investigators at Donovan received information that Garcia was going to conduct some criminal activity for the Mexican Mafia at the prison. Unbeknownst to the inmates, microphones were placed in the plumbing chase between two cells where Garcia was located so that law enforcement officers could glean intelligence. In one recorded conversation, which was played for the jury, Garcia dictated a kite to his cellmate, Juan Morones, giving a direct order for the stabbing of Ortiz.

Knowing from the kites that he might get stabbed, Ortiz went outside to the prison yard on July 5, 2010, at approximately 12:20 p.m., and walked laps with [Petitioner]. Ortiz testified that as he walked and talked with [Petitioner], he observed other inmates walking towards a corner near a toilet stall. [Petitioner] then swung his hand at Ortiz's face, and Ortiz raised his right hand to block the strike and protect his face. Ortiz felt something cutting his hand. Ortiz testified that [Petitioner] was trying to stab him in the neck.

Ortiz also testified that Macias approached him and slashed his head with a razor while Quinteros punched him and held him down.[9] Another inmate named "Cobra" Valencia also assaulted Ortiz. As correctional officers fired shots of increasing lethality, Ortiz's attackers continued to assault him by punching, kicking, and stabbing him, and banging his head against a wall

---

sneak it under his tongue, in his tooth, in his gums, or if he has to, in his private areas or his toes, or anywhere, because he gets searched." He stated that kites are "confidential communications between inmates" that "generally talk about either Mexican Mafia or prison politics."

[9] Gonzalez was attacked at the same time as Ortiz.

while he tried to cover up and defend himself. As a result of the razor slashes, Ortiz suffered cuts to his head, back, and hand. Macias flushed the razor down the toilet. A video of the incident was played for the jury.

### B. *The Defense*

Macias testified that Ortiz was angry with him because a girl named Priscilla liked him. To antagonize Ortiz, Macias took a picture of himself kissing Priscilla and sent it to Ortiz. Macias testified he was not involved in a conspiracy to murder Ortiz, and he denied receiving instructions to murder him. He claimed he never received a kite about "putting a hit" on Ortiz.

Macias also testified he and Ortiz argued because Macias was upset that Ortiz had made jokes about the fact that he had been incarcerated for beating up a person in a wheelchair. Following this argument, Macias began carrying a razor in his mouth when he went to the prison yard. On the day of the incident, Macias saw Ortiz walking with Macias's friend, [Petitioner]. Macias testified that Ortiz took a "cheap shot" at [Petitioner] by punching him from the side. Macias removed the razor from his mouth and began "slicing" Ortiz. Macias also testified he had no intent to kill Ortiz, as the razor was small and flimsy. He stated that he flushed the razor down the toilet. He also testified that Quinteros tried to break up the fight.

Several other inmates testified in Macias's defense. Ortiz's cellmate, Angel Cuadra, testified that Ortiz said he was going to attack [Petitioner]. Martin Madrid testified that Ortiz told him Macias had taken his girlfriend, Priscilla, from him. Another of Ortiz's cellmates, Anthony Barrera, testified that Ortiz carried razor blades and was angry with Macias because of a woman. "Stomper" Gonzalez testified he witnessed the fight in the yard between Ortiz and [Petitioner]. He stated that Ortiz started the fight by hitting [Petitioner]. Gonzalez stated he also became involved in a mutual fight. Gonzalez testified he did not believe a hit was put on him.

(ECF No. 16-14 at 6-10.)

## PETITIONER'S CLAIMS HEREIN

1.     Petitioner's right to due process was violated when the trial court failed to properly instruct the jury on the required elements of the conspiracy charge, and gave unclear and misleading instructions on aiding and abetting. (Pet. at 6-9.) As part of his due process claim, Petitioner further contends there was insufficient evidence to find him guilty of conspiracy. (*Id*. at 7.)

9

2.     Petitioner's Sixth and Fourteenth Amendment rights were violated when the trial judge refused to call a mistrial after the jury witnessed Petitioner's co-defendant "slash" his own attorney.  (Pet. at 10-12.)

3.     Petitioner's Sixth and Fourteenth Amendment rights were violated when the trial judge refused to call a mistrial after the jury saw Petitioner shackled during trial.  (Pet. at 13-14.)  Petitioner's rights were also violated when the trial judge abdicated decision-making responsibility to security personnel regarding Petitioner's shackling, failed to guarantee his right to a fair trial by not holding a hearing to ensure Petitioner would not suffer prejudice as a result of the shackling, and failed to consider an alternative remedy. (*Id.*)[10]

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S.

---

[10]     Petitioner asserts part of his Ground 3 shackling claim in Ground 2, but the Court will address his entire claim related to shackling in Ground 3.  (*See* Pet. at 10-12.) In addition, as part of Ground 3, Petitioner appears to assert a cumulative error claim, which the Court will address separately below.  (*See id*. at 13-14.)

362, 412 (2000); *see also Carey v. Musladin*, 549 U.S. 70, 74 (2006).

Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *See Williams*, 529 U.S. at 391, 404-05, 413. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Williams*, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *See Williams*, 529 U.S. at 406. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *See Early*, 537 U.S. at 8.

State court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review only "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or based on 'an *unreasonable* determination of the facts.'" *See Early*, 537 U.S. at 11 (citing 28 U.S.C. § 2254(d)) (emphasis added). A state-court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *See Williams*, 529 U.S. at 406-10, 413 (*e.g.,* the rejected decision may state the *Strickland* standard correctly but apply it unreasonably); *Woodford v. Visciotti*, 537 U.S. 19, 24-27 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Visciotti*, 537 U.S. at 24-27; *Williams*, 529 U.S. at 413. An "unreasonable application" is different from an erroneous or incorrect one. *See Williams*, 529 U.S. at 409-10; *Visciotti*, 537 U.S. at 25; *Bell v. Cone*, 535 U.S. 685, 699 (2002). Moreover, review of state court decisions under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *See Cullen v.*

*Pinholster*, 563 U.S. 170, 181-82 (2011).

As the Supreme Court explained in *Harrington v. Richter*, 562 U.S. 86 (2011):

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here [*i.e.*, where there was no reasoned state-court decision], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Id.* at 102.

Furthermore, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See id.* at 103.

Here, claims encompassing Grounds 1-3 of the Petition were raised by Petitioner on direct appeal and denied by the Court of Appeal in a reasoned decision. Those same claims encompassing Grounds 1-3 were then presented in Petitioner's Petition for Review, which the California Supreme Court denied. Accordingly, for purposes of applying the AEDPA standard of review to Grounds 1-3 herein, the Court of Appeal decision on direct appeal constitutes the relevant state court adjudication on the merits. *See Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (where state supreme court denied discretionary review of decision on direct appeal, the decision on direct appeal is the relevant state-court decision for purposes of the AEDPA standard of review).

## DISCUSSION

**A.** **Habeas Relief is Not Warranted With Respect to Ground 1 of the Petition.**

In Ground 1 of the Petition, Petitioner claims the trial court violated the due process clause of the Fourteenth Amendment by failing to properly instruct the jury on the required elements of the conspiracy charges. (Pet. at 2, 6.) Petitioner contends that the trial court

failed to properly instruct the jury by not giving clearer instructions for CALCRIM Nos. 415 and 563. (*Id*. at 6.) Petitioner further contends the use of "a defendant" interchangeably with "the defendant" in the conspiracy instructions confused the jury, and that the consistent use of the phrase "the defendant" throughout the jury instructions would have prevented confusion because it would have specifically referred to Petitioner. (*Id*.)

Petitioner also claims that the trial court misled the jury by giving aiding and abetting instructions, CALCRIM Nos. 400 and 401, which did not limit criminal liability as an aider and abettor to the offenses of attempted murder and aggravated assault. (*Id*.) Petitioner contends that the aiding and abetting instructions given to the jury were confusing and misleading in light of the prosecution's theory of the case, which conflated the burden of proof for conspiracy with the burden of proof for aiding and abetting. (*Id*. at 6-9.)

Lastly, Petitioner claims that there was insufficient evidence to prove beyond a reasonable doubt that he participated in any conspiracy, or even had knowledge of one. (*Id*. at 7.) Petitioner contends that the prosecution had no evidence to prove his involvement in a conspiracy to commit murder, which is why the prosecution confused the jury with the aiding and abetting instruction. (*Id*.)

### 1.   Applicable Federal Law

"What the factfinder must determine to return a verdict of guilty is prescribed by the Due Process Clause." *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993). "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A "jury instruction violates due process if it fails to give effect to that requirement." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (citing *Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1079)).

On federal habeas review of instructional error by a state court, federal courts are bound by a state court's interpretation of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see also Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (the fact that a jury

instruction "was allegedly incorrect under state law is not a basis for habeas relief"). Federal habeas relief based on instructional error is warranted only if the petitioner shows "both that the instruction was ambiguous and that there was '"a reasonable likelihood"'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (citing *Estelle*, 502 U.S. at 73, n.4 (quoting *Boyde v. California*, 494 U.S. 370, 379-80 (1990))).

In making this determination, the jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton*, 541 U.S. at 437. "Because it is not enough that there is some 'slight *possibility*' that the jury misapplied the instruction, *Weeks v. Angelone*, 528 U.S. 225, 236 (2000), the pertinent question 'is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,"'" *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147)." *Waddington*, 555 U.S. at 191.

### 2. Conspiracy Instructions

#### a. *Background*

Petitioner's jury received the following relevant conspiracy instructions:

**415. CONSPIRACY**

I have explained that <u>a defendant</u> may be guilty of a crime if he either commits the crime or aids and abets the crime. He may also be guilty if he is a member of a conspiracy.

To prove that <u>a defendant</u> was a member of a conspiracy in this case, the People must prove that:

    1.    <u>A defendant</u> intended to agree and did agree with one or more of inmates loyal to the Mexican mafia to commit the crime of murder;

2.    At the time of the agreement, <u>a defendant</u> and one or more of the other alleged members of the conspiracy intended that one or more of them would commit murder;

3.    One of <u>the defendants</u> or one of the inmates loyal to the Mexican mafia, committed at least one of the following alleged overt acts to accomplish the crime of murder:

- On or about July 2, 2010, Jose Manuel Garcia, told his cell mate, Juan Morones, to write an inmate message ("Kite") to have inmates Victoriano Ortiz [Cyco] and Manual Gonzalez [Stomper] murdered immediately ("whacked"). Specifically, Garcia told Morones to write the following: Direct orders from the Carnal, Cyco from Brole and Stomper from Market are to be whacked on the next yard ASAP. No exceptions.

- Eduardo Macias took a razor to the yard.

- On or about July 5, 2010, inmates Ortiz and Gonzalez were in the prison yard for their group yard activities. While in the yard, Ortiz was assaulted by inmates Polina, Macias, Valencia And Quinteros;

- On or about July 5, 2010, Polina used an inmate manufactured weapon in his possession to try to cut the neck of inmate Ortiz, who sustained a cut to his hand when he shielded his neck from being cut by Polina in the attack;

- On or about July 5, 2010, Polina, Macias, Valencia, And Quinteros inflicted other cuts to the body of inmate Ortiz while Valencia and Quinteros punched and tried to hold the arms of Ortiz during the attack.

4.    An overt act was committed in California.

To decide whether <u>a defendant</u> committed one of these overt acts, consider all of the evidence presented about the acts.

To decide whether <u>a defendant</u> and one or more of the other alleged members of the conspiracy intended to commit the crime of murder, please refer to the separate instructions that I will give you on that crime.

The People must prove that the members of the alleged conspiracy had an agreement and intent to commit the crime of murder. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or

15

formal agreement to commit the crime of murder. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

An *overt act* is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime. The overt act must happen after a defendant has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.

You must all agree that at least one alleged overt act was committed in California by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the overt act or acts.

You must make a separate decision as to whether each defendant was a member of the alleged conspiracy.

The People allege that a defendant conspired to commit murder. You may not find a defendant guilty of conspiracy unless all of you agree that the People have proved that a defendant conspired to commit murder.

A member of a conspiracy does not have to personally know the identity or roles of all the other members.

Someone who merely accompanies or associates with members of a conspiracy but who does not intend to commit the crime is not a member of the conspiracy.

Evidence that a person did an act or made a statement that helped accomplish the goal of the conspiracy is not enough, by itself, to prove that the person was a member of the conspiracy.

## 563. CONSPIRACY TO COMMIT MURDER

The defendants are charged in Count One with conspiracy to commit murder. To prove that a defendant is guilty of this crime, the People must prove that:

1. A defendant intended to agree and did agree with one or more inmate loyal to the Mexican mafia to commit the crime of murder;

2. At the time of the agreement, a defendant and one or more of the other alleged members of the conspiracy intended that one or

16

more of them would commit murder;

3.    One of <u>the defendants</u> or one of the inmates loyal to the Mexican mafia, committed at least one of the following alleged overt acts to accomplish the crime of murder:

- On or about July 2, 2010, Jose Manuel Garcia, told his cell mate, Juan Morones, to write an inmate message ("Kite") to have inmates Victoriano Ortiz [Cyco] and Manual Gonzalez [Stomper] murdered immediately ("whacked"). Specifically, Garcia told Morones to write the following: Direct orders from the Carnal, Cyco from Brole and Stomper from Market are to be whacked on the next yard ASAP. No exceptions.

- On or about July 5, 2010, inmates Ortiz and Gonzalez were in the prison yard for their group yard activities. While in the yard, Ortiz was assaulted by inmates Polina, Macias, Valencia And Quinteros;

- On or about July 5, 2010, Polina used an inmate manufactured weapon in his possession to try to cut the neck of inmate Ortiz, who sustained a cut to his hand when he shielded his neck from being cut by Polina in the attack;

- On or about July 5, 2010, Polina, Macias, Valencia, And Quinteros inflicted other cuts to the body of inmate Ortiz while Valencia and Quinteros punched and tried to hold the arms of Ortiz during the attack.

4.    An overt act was committed in California.

To decide whether <u>a defendant</u> committed these overt acts, consider all of the evidence presented about the overt acts.

To decide whether <u>a defendant</u> and one or more of the other alleged members of the conspiracy intended to commit murder, please refer to Instructions which define the crime of murder. (Please see Definition of Homicide below.)

The People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

17

An *overt act* is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime. The overt act must happen after <u>the defendant</u> has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.

You must all agree that at least one alleged overt act was committed in California by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the overt act or acts.

You must make a separate decision as to whether <u>each defendant</u> was a member of the alleged conspiracy.

A member of a conspiracy does not have to personally know the identity or roles of all the other members.

Someone who merely accompanies or associates with members of a conspiracy but who does not intend to commit the crime is not a member of the conspiracy.

Evidence that a person did an act or made a statement that helped accomplish the goal of the conspiracy is not enough, by itself, to prove that the person was a member of the conspiracy.

(ECF No. 16-1 at 114-16, 122-24; ECF No. 16-14 at 12-15 (underlining emphasis added).)

Before the Court of Appeal, Petitioner contended that his conviction on Count 1 of conspiracy to commit murder must be reversed because:

"… the conspiracy instructions did not require the jury to find that he personally participated in the conspiracy and personally harbored the specific intent to kill Ortiz." In support of this claim of instructional error, [Petitioner] assert[ed] "the conspiracy instructions only required the jury to find that '[*a* *defendant*' intended to agree and did agree with one or more inmates to [murder Ortiz]." (Italics added.) He also assert[ed] that the term "[a] defendant" as used in the conspiracy instructions "mean[t] *any one of the three defendants on trial* [([Petitioner], Macias, or Quinteros)], must have entered into such an agreement with other inmates loyal to the Mexican Mafia." (Italics added.)

Based on his foregoing interpretation of the term "[a] defendant" as used in the conspiracy instructions given to the jury, [Petitioner] further assert[ed] that "the instructions given permitted the jury to convict [him] of conspiracy even if the jury concluded only Macias was an actual participant in the conspiracy and harbored the specific intent to kill." Thus, he contend[ed], "his conviction

for conspiracy must be reversed for instructional error because it is reasonably probable, based on the evidence presented at trial and the instructions given, that the jury found him guilty of conspiracy without finding he specifically intended to agree to murder Ortiz and also specifically intended to murder him."

(ECF No. 16-14 at 21-22 (emphasis in original).)

Although the Court of Appeal acknowledged that the standard conspiracy instructions set forth in CALCRIM Nos. 563 and 415 use the terms "The/the defendant" rather than "A/a defendant" in explaining the specific intent elements, the Court of Appeal rejected Petitioner's claim that the conspiracy instructions given at trial incorrectly stated the law regarding the elements of conspiracy to commit murder. (*Id*. at 23-24.) Specifically, the Court of Appeal rejected Petitioner's assertion that "the term '[a] defendant,' as used in the portions of the conspiracy instructions pertaining to the specific intent elements of the count 1 conspiracy offense, meant 'any one of the three defendants'—[Petitioner], Macias, or Quinteros—that were on trial in th[e] case, for the simple reason that the two terms are not synonymous." (*Id*.) The Court of Appeal added:

As noted, the first sentence of the modified version of CALCRIM No. 563 given to the jury, using the plural term "The defendants," stated: "*The defendants* are charged in Count One with conspiracy to commit murder." (Italics added.) Obviously, this sentence informed the jury that *each* of the three defendants in this case was charged in count 1 with conspiracy to commit murder.

Immediately after thus informing the jury that *each* of the three defendants in this case was charged in count 1 with conspiracy to commit murder, the instruction then used the singular term "a defendant" in explaining to the jury the elements that the prosecution was required to prove in order for the jury to find a given defendant guilty of count 1. Specifically, as already noted, the instruction stated:

"To prove that *a defendant* is guilty of this crime, the People must prove that: [¶] 1. A defendant intended to agree and did agree with one or more of inmate loyal to the Mexican mafia to commit the crime of murder; [¶] 2. At the time of the agreement, a defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit

19

murder . . . ." (Italics added.)
(*Id*. at 24 (emphasis in original).)

Thus, the Court of Appeal held that "[a]ny reasonable jury would understand that the term 'a defendant' in the first clause—'To prove that *a defendant* is guilty of this crime' (italics added)—meant 'a given defendant,' and that the subsequent use of the term 'a defendant' in this portion of the instruction meant the *same* defendant, *not* 'any one of the three defendants.'" (*Id*.)  The Court of Appeal accordingly rejected Petitioner's claim that the conspiracy instructions incorrectly stated the law regarding the elements of conspiracy to commit murder.  (*Id*.)

### b.    *Analysis*

As a preliminary matter, the Court is bound by the Court of Appeal's determination that the conspiracy instructions given, CALCRIM Nos. 415 and 563, correctly stated California law regarding the elements of conspiracy to commit murder.  *See Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 71-72.

Next, the Court finds the Court of Appeal reasonably concluded that the trial court's instructions to the jury on conspiracy were not ambiguous.  *See Waddington*, 555 U.S. at 191 (finding the Washington courts reasonably concluded a certain jury instruction was not ambiguous where it was "impossible to assign any meaning to th[e] instruction different from the meaning given to it by the Washington courts").  For the same reasons given by the Court of Appeal, as set forth above, the Court finds that CALCRIM Nos. 415 and 563, as given at trial, were not ambiguous, as it is impossible to assign any meaning to the instructions different than the meaning given by the Court of Appeal.  Because the conclusion of the Court of Appeal that the jury instructions were unambiguous was not objectively unreasonable, the Court's § 2254(d)(1) inquiry should end here.  *See id*. at 190-92.

However, even if assuming *arguendo* that the instructions were ambiguous, the Court finds that the Court of Appeal reasonably applied Supreme Court precedent when it

20

determined that there was no "reasonable" likelihood that the jury applied the conspiracy instructions in a way that relieved the prosecution of its burden of proving every element of the crime beyond a reasonable doubt. *See id*. at 192-93; *see also* ECF No. 16-14 at 22. ("Petitioner "has failed to demonstrate a reasonable probability that the jury convicted him of count 1 [conspiracy] without finding that he (1) specifically intended to agree or conspire to murder Ortiz, and (2) specifically intended to murder him.").

The record reflects that during jury instructions, the trial judge began by stating: "All the defendants in this case are charged with the same crimes. You must separately consider the evidence as it applies to *each defendant*. You *must decide each charge for each defendant separately*." (ECF No. 16-9 at 23 (emphasis added).) The trial judge then went on to instruct the jury that in order to be guilty of the crime of conspiracy, a defendant must have done so with a specific intent or mental state, and that if the prosecution does not prove their case beyond a reasonable doubt, the jury "must find the defendants, *or any individual defendant against whom the case has not been proven*, not guilty." (*Id*. at 30, 31 (emphasis added).) Later, when instructing the jury on the conspiracy charge, the trial judge specifically stated, on multiple occasions, that the jury "must make a separate decision as to whether *each defendant* was a member of the alleged conspiracy." (*Id*. at 40, 47 (emphasis added).)

Thereafter, in closing arguments, the prosecutor stated:

> During jury selection I told you you will be given a verdict form, and the verdict form would simply ask you one question per count. Did I prove the count beyond a reasonable doubt *as to each defendant*?
>
> Nothing has changed. My burden of proof has not changed one bit. I still have to convince you that the evidence we presented in this trial convinces you beyond a reasonable doubt that *each defendant is guilty of each charge*.
>
> . . .
>
> The verdict form looks like this. You're going to get one for each defendant. . . . [W]e're asking you to answer the same question for each count. Only that question for all defendants, each defendant, is to be – *the decision as to each defendant has to be independent*. Consider the totality of the

evidence for *each defendant*, but *each decision has to be independent*, each count is independent.

(*Id.* at 67-68 (emphasis added).)

The prosecutor proceeded to walk the jury through each charge and argue why "each defendant is guilty of that particular charge." (*Id.* at 70.) For the conspiracy to commit murder charge, the prosecutor argued that all three defendants joined the conspiracy, at the very least, "at the time of the attack, because [it was] a coordinated attack" and "as soon as they ma[d]e a move to attack Ortiz, that shows their membership in that conspiracy . . . ." (*Id.* at 83.)

Based on the foregoing, regardless of any alleged ambiguity in the use of the terms "a defendant" and "the defendant" in the conspiracy instructions, the jury was properly instructed that it must find guilt as to each defendant individually. The trial record also evidences that the jury understood the conspiracy instructions, as it found two of the three defendants, Petitioner and Macias, guilty of conspiracy, and found the third defendant, Quinteros, not guilty of conspiracy. (*Id.* at 202-05.)[11]

Given the foregoing, the Court finds the allegedly ailing conspiracy instructions, by themselves, did not so infect the entire trial that the resulting conviction violated due process, and that it was not objectively unreasonable for the Court of Appeal to conclude the jury convicted Petitioner of conspiracy only because it believed he specifically intended to agree or conspire to murder Ortiz, and that he specifically intended to murder him.

Accordingly, Petitioner is not entitled to habeas relief on this part of Ground 1.

---

[11] Moreover, the trial record supports the jury's finding that Quinteros was not part of the conspiracy, thus further indicating the jurors understood the conspiracy instructions. Unlike Petitioner and Macias, Quinteros's name was not mentioned in the alleged kite, and he was not mentioned on the prison recording. (*See* ECF No. 16-4 at 131-35; ECF No. 16-5 at 116-84; ECF No. 16-7 at 10; ECF No. 16-9 at 148.) In addition, the parties stipulated during the trial that Quinteros was not a documented street gang member and not a validated Mexican Mafia associate, and had been in Ad. Seg. Yard for only 17 days as of July 5, 2010, the date of the incident. (*See* ECF No. 16-6 at 137; ECF No. 16-7 at 90.)

### 3. Aiding and Abetting Instructions

#### a. *Background*

Petitioner's jury received the following aiding and abetting instructions:

## 400. AIDING AND ABETTING: GENERAL PRINCIPLES

A person may be guilty of a crime in two ways. One, he may have directly committed the crime. Two, he may have aided and abetted someone else, who committed the crime. In these instructions, I will call that other person the "perpetrator." A person is equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it.

## 401. AIDING AND ABETTING: INTENDED CRIMES

To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

1. The perpetrator committed the crime;

2. The defendant knew that the perpetrator intended to commit the crime;

3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND

4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

A person who aids and abets a crime is not guilty of that crime if he withdraws before the crime is committed. To withdraw, a person must do two things:

1. He must notify everyone else he knows is involved in the commission of the crime that he is no longer participating. The notification must be made early enough to prevent the commission of the crime. AND

2.    He must do everything reasonably within his power to prevent the crime from being committed. He does not have to actually prevent the crime.

The People have the burden of proving beyond a reasonable doubt that a defendant did not withdraw. If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory.

(ECF No. 16-1 at 111-13.)

b.    *Analysis*

Petitioner contends the prosecution confused the jury by not limiting the aiding and abetting instructions given at trial, CALCRIM Nos. 400 and 401, to the offenses of attempted murder and aggravated assault. (Pet. at 6.) Petitioner further contends that the prosecution's closing argument regarding the conspiracy charge – that all three defendants joined the conspiracy, at the very least, "at the time of the attack, because it [was] a coordinated attack" – was confusing to the jury. (*See id.* at 6-7; ECF No. 16-9 at 83.) Petitioner asserts that this line of argument may have caused the jury to confuse the theory of aiding and abetting, which does not require a prior agreement, with conspiracy, which does require such an agreement. (ECF No. 16-12 at 26.) In other words, Petitioner argues the jury may have found Petitioner guilty of conspiracy on an aiding and abetting theory, which is insufficient under the law.

As the Court of Appeal stated:

A conviction for conspiracy requires proof of four elements: (1) an agreement between two or more people, (2) who have the specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024.)

(ECF No. 16-14 at 19.) Liability on an aiding and abetting theory, on the other hand, does not require an agreement between two or more people. (ECF No. 16-1 at 112-13 (CALCRIM 401).) Therefore, Petitioner argues that a person can aid and abet without entering a conspiracy; however, an aider and abettor cannot be held liable for the crime of

24

conspiracy without more.  (*See* Pet. at 8.)

The Court of Appeal addressed this argument and rejected Petitioner's contention that the prosecution relied on an improper legal theory.  (ECF No. 16-14 at 26.)  The Court of Appeal reasoned:

> Finally, contrary to [Petitioner]'s contention, the record does not show that the prosecution relied on the improper legal theory that [Petitioner] could be found guilty of conspiracy by aiding and abetting the assault on Ortiz in the prison yard. CALCRIM No. 415, which the court gave to the jury, informed the jury that conspiracy was separate and distinct from aiding and abetting. Specifically, the instruction explained that "a defendant may be guilty of a crime if he either commits the crime or aids and abets the crime. He may also be guilty if he is a member of a conspiracy."  During his closing argument, the prosecutor specifically argued that [Petitioner], Macias, and Quinteros "all committed the crime of conspiracy to commit murder" and that aiding and abetting was only relevant to the attempted murder charge, and only as to Quinteros.

(*Id.*)

Even assuming the aiding and abetting instructions given to the jury were ambiguous, Petitioner is not entitled to relief unless he demonstrates that there was a "reasonable likelihood" that the jury applied the instructions in a way that relieved the People of its burden of proving every element of the crime beyond a reasonable doubt. *See Waddington*, 555 U.S. at 190-91.  Here, the Court finds that the Court of Appeal reasonably determined that the prosecutor's closing argument did not cause the jury to apply the aiding and abetting instructions in a way that relieved the People of its burden as to the conspiracy charge. *See id*. at 192-93.

///

///

///

///

///

///

At no point did the trial court, the prosecution, Petitioner's counsel,[12] or the jury instructions indicate that the jury could find Petitioner liable for conspiracy to commit murder on an aiding and abetting theory. (*See e.g.*, ECF No. 16-9 at 73-95; ECF No. 16-1 at 114-16 (CALCRIM No. 415); 117-18 (CALCRIM No. 417).) At all times during the trial, it was clear that the prosecution needed to prove, and the jury needed to find, that Petitioner intended to enter an agreement, and did enter an agreement, in order to be held liable for the crime of conspiracy to commit murder. As the prosecutor clearly stated in his closing remarks:

> We're asking you to make a finding that [Petitioner] joined the conspiracy, that [Petitioner] attempted a murder, either by himself when he was going for the jugular or for the neck, or as an aider and abettor when he's holding Ortiz as Macias is slashing him like in the movies, and that he participated in the assault by means likely to cause great bodily harm.

> I did not prove to you when -- I'm sorry, let me rephrase that. I proved to you that these defendants joined the conspiracy in the yard. And I conceded the fact that maybe they knew ahead of time in their cells, but I don't know. Okay. I don't have to prove to you the -- if they joined the conspiracy before the yard, I just have to prove to you they in fact joined the conspiracy. . . . .

(ECF No. 16-9 at 187.)

Based on the foregoing, the Court finds that Petitioner has failed to demonstrate that the Court of Appeal's rejection of his aiding and abetting jury instruction claim either was contrary to, or involved an unreasonable application of, clearly established Supreme Court

---

[12]     Petitioner's counsel argued during closing arguments that the prosecution failed to prove each and every element of a conspiracy beyond a reasonable doubt, claiming that there was no evidence of an agreement, and no overt act because Petitioner did not have a weapon. (ECF No. 16-9 at 133-34.) Petitioner's counsel argued the incident at issue "was simply a fight." (*Id*. at 136.) Petitioner's counsel also addressed the aiding and abetting claim stating that one of the elements is "intent," and the prosecution has "to prove beyond a reasonable doubt that [Petitioner] knew what Mr. Macias was going to do," and asserting "[t]here's no proof of that." (*Id*. at 139-40.) Petitioner's counsel did not discuss aiding and abetting in regards to the conspiracy charge.

law.

Accordingly, Petitioner is not entitled to habeas relief on this part of Ground 1.

### 4. Petitioner's Related Sufficiency of the Evidence Claim

As the final part of his due process claim, Petitioner contends there was insufficient evidence to prove beyond a reasonable doubt that he participated in any conspiracy, or even had knowledge of one. (Pet. at 7.) Petitioner argues that the prosecution had no evidence to prove his involvement in a conspiracy to commit murder, which is why the prosecution confused the jury with the aiding and abetting instruction. (*Id*.)

### a. *Applicable Federal Law*

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. at 364; *accord Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Thus, a state prisoner who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). But the prisoner faces a "heavy burden" to prevail on such a claim. *Juan H*., 408 F.3d at 1274, 1275 n.13. The question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

When determining the sufficiency of the evidence, a reviewing court makes no determination of the facts in the ordinary sense of resolving factual disputes. *Sarausad v. Porter*, 479 F.3d 671, 678 (9th Cir.), *vacated in part*, 503 F.3d 822 (9th Cir. 2007), *rev'd on other grounds*, 555 U.S. 179 (2009). Rather, the reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all

conflicts in a manner that supports the verdict." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995); *see also Jackson*, 443 U.S. at 319, 324, 326. Thus, in determining the sufficiency of the evidence, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995); *see also United States v. Lindsey*, 634 F.3d 541, 552 (9th Cir. 2011); *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are . . . entitled to near-total deference under *Jackson*.").

While "mere suspicion or speculation cannot be the basis for the creation of logical inferences," *Maass*, 45 F.3d at 1358 (citation and internal quotation marks omitted), "[c]ircumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred, and is not to be distinguished from testimonial evidence insofar as the jury's fact-finding function is concerned." *United States v. Stauffer*, 922 F.2d 508, 514 (9th Cir. 1990). Furthermore, "to establish sufficient evidence, the prosecution need not affirmatively rule out every hypothesis except that of guilt." *Schell v. Witek*, 218 F.3d 1017, 1023 (9th Cir. 2000) (en banc) (citation and internal quotation marks omitted).

In post-AEDPA cases, where, as here, a state court has issued a reasoned decision rejecting a claim of insufficient evidence under a standard that is not "contrary to" *Jackson*, a reviewing federal court applies an additional layer of deference. *Juan H.*, 408 F.3d at 1274. "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam) (citation and internal quotation marks omitted); *see also Juan H.*, 408 F.3d at 1275 n.13. This "double dose of deference . . . can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011); *see also Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam) ("We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference").

Thus, a state court's resolution of an insufficiency of the evidence claim is evaluated

under 28 U.S.C. § 2254(d)(1), not § 2254(d)(2). *See Emery v. Clark*, 643 F.3d 1210, 1213-14 (9th Cir. 2011) ("When we undertake collateral review of a state court decision rejecting a claim of insufficiency of the evidence pursuant to 28 U.S.C. § 2254(d)(1) . . . we ask only whether the state court's decision was contrary to or reflected an unreasonable application of *Jackson* to the facts of a particular case"); *see also Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) ("The pivotal question, then, is whether the California Court of Appeal . . . unreasonably applied *Jackson* in affirming Petitioner's conviction for second-degree murder"); *Boyer*, 659 F.3d at 965 ("[T]he state court's application of the *Jackson* standard must be 'objectively unreasonable' to warrant habeas relief for a state court prisoner"); *Juan H.*, 408 F.3d at 1275 ("[W]e must ask whether the decision of the California Court of Appeal reflected an 'unreasonable application of' *Jackson* and *Winship* to the facts of this case") (citing 28 U.S.C. § 2254(d)(1)).

Finally, in adjudicating an insufficiency of the evidence claim, a federal habeas court "look[s] to [state] law only to establish the elements of [the crime] and then turn[s] to the federal question of whether the [state court] was objectively unreasonable in concluding that sufficient evidence supported [the conviction]." *Juan H.*, 408 F.3d at 1278 n.14 (citation omitted); *see also McCurdy v. Attorney Gen.*, 229 F. App'x. 665, 666-67 (9th Cir. 2007) ("We look to [state] law only to establish the elements of the crime and then turn to the federal question of whether the state court was objectively unreasonable in concluding that sufficient evidence supported the conviction")(citation, internal alterations and quotation marks omitted); *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004) (en banc) ("The *Jackson* standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law") (citation and internal quotation marks omitted). In determining whether the evidence was sufficient, a federal court must follow the California courts' interpretation of state law. *Bradshaw*, 546 U.S. at 76; *Emery*, 643 F.3d at 1214.

///

///

29

b.  *Analysis*

Under California law, a conviction for conspiracy requires proof of the following four elements:

> (1) an agreement between two or more people, (2) who have the specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024.)

(*See* ECF No. 16-14 at 19; *see also* Trav. at 9-10.)

In rejecting Petitioner's insufficiency of the evidence claim, the Court of Appeal did not explicitly refer to *Jackson*.  (*See* ECF No. 16-14 at 25-26.)  However, the California standard for determining sufficiency of the evidence to support a conviction has been held by the California Supreme Court to be identical to the federal standard enunciated by the United States Supreme Court in *Jackson*.  *See People v. Johnson*, 26 Cal. 3d 557, 576 (1980).

In finding that there was sufficient evidence to support a conspiracy conviction, the Court of Appeal reasoned as follows:

> [Petitioner] specifically acknowledges that "[t]he initiators of the conspiracy, Jose Manuel Garcia and Juan Gabriel Morones, were recorded discussing direct orders to kill several inmates, including [[Petitioner]] and Ortiz," and "[t]here was some evidence that [[Petitioner]] . . . had [his] name[] taken out of the 'hat' by some other inmate with the proviso that [he] participate in the pending assault [on Ortiz]."  This evidence, when considered with Ortiz's testimony that [Petitioner] tried to cut his neck during the videotaped prison yard assault, is sufficient to "support[] an inference that the parties . . . tacitly came to a mutual understanding to commit a crime" (*People v. Prevost*, *supra,* 60 Cal.App.4th at p. 1399), here the murder of Ortiz.

(ECF No. 16-14 at 25-26.)

The gravamen of Petitioner's challenge to the Court of Appeal's rejection of his insufficiency claim appears to be that he disputes the Court of Appeal's statement in its opinion that "it is not necessary to demonstrate that the parties met and actually agreed to undertake the unlawful act," but rather a conspiracy may be proved through circumstantial

30

evidence. (*See* Pet. at 6-9; Trav. at 12 (citing ECF No. 16-14 at 25 (citing *People v. Prevost*, 60 Cal. App. 4th 1382, 1399 (1998); *People v. Vu*, 143 Cal. App. 4th 1009, 1024-25 (2006)).) According to Petitioner, this is an inaccurate statement of the law. (*See* Trav. at 12.) However, the fallacy of Petitioner's contention is that the Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *See Bradshaw*, 546 U.S. at 76. Moreover, as noted above, for purposes of the *Jackson* standard, circumstantial evidence can be used to prove any fact. *See Stauffer*, 922 F.2d at 514.

For the foregoing reasons, the Court finds that Petitioner has failed to establish that the Court of Appeal's rejection of his insufficiency of the evidence claim was contrary to, or involved an unreasonable application of, clearly established Supreme Court law.

Accordingly, Petitioner is not entitled to habeas relief on this last part of Ground 1.

**B.  Habeas Relief is Not Warranted with Respect to Ground 2 of the Petition.**

In Ground 2 of the Petition, Petitioner claims his Sixth and Fourteenth Amendment rights were violated when the trial judge refused to call a mistrial after the jury witnessed Petitioner's co-defendant Macias "slash" his own attorney. (Pet. at 10-12.)

**1.   Background of the Macias incident**

Based on its independent review of the record, the Court adopts the following factual summary of the Macias incident from the Court of Appeal opinion as a fair and accurate summary of the underlying facts[13]:

---

[13]   The Court notes that Petitioner does not contend the Court of Appeal's recitation of the background facts related to the Macias incident is inaccurate in any respect. Moreover, Petitioner's discussions of the Macias incident in his filings before the Court of Appeal and California Supreme Court are not inconsistent with the Court of Appeal's factual summary. (*See* ECF No. 16-12 at 30-39; ECF No. 16-15 at 26-31.) The Court

### [a].  *Macias's courtroom assault on his attorney and related proceedings that day*

On December 13, 2012, after Quinteros, Macias, and [Petitioner] rested their cases, the prosecution recalled Ignacio Bravo, a correctional officer at Donovan Prison, as its first rebuttal witness. As Officer Bravo was testifying, Macias slashed his attorney, William Burgener, in the face with a small razor blade he had concealed in his mouth. Burgener jumped up and exclaimed, "What the fuck did you do to me?" Macias tried to stand up but could not do so because he was bolted down. A bailiff said, "Call first aid." The bailiffs then jumped on Macias. The court said, "Everybody stay right there."

Immediately thereafter, Macias stated, "It didn't have nothing to do with you guys. Officer Bravo—" The court silenced him, stating, "Mr. Macias, you need to keep quiet." The jurors left the courtroom after the defendants were removed from the courtroom. Burgener was taken to the hospital where he received stitches for his wound.

Outside the presence of the jury, in another courtroom, the trial judge summarized what had occurred:

> "So we were in a different department, Department 25, when Officer Bravo was about to testify as a rebuttal witness for the prosecution.  He was the last witness before we were going to instruct the jurors.  And as soon as Mr. Bravo took the stand, Mr. Macias apparently had secreted a small—very small razor blade that had some cloth wrapped around the bottom of it, so it was probably maybe a quarter of an inch point, maybe, or maybe three-eighths of an inch point.  And he slashed—I guess it was in his mouth. He took it out of his mouth and he slashed Mr. Burgener with it.
>
> "[Macias] was I bolted to the floor so he couldn't get up. And so then Mr. Burgener jumped up and yelled and had blood on his

---

further notes that it was not provided with a transcript of the trial court's December 14, 2012 *in camera* hearing during which the trial judge questioned each juror to see if they felt they could proceed with the trial.  (*See* ECF No. 16-2 at 98.)  However, the Court of Appeal's opinion does not conflict with Petitioner's discussion of what occurred during this hearing, Respondent's account of what occurred, or the trial court's discussion of the outcome.  (*See* ECF No. 16-13 at 29-37; ECF No. 16-8 at 56-73.)

face, and apparently, according to Agent Epperson,[14] had a pretty deep cut on his jawline on his right side.

"So Mr. Burgener had to go to the hospital because it looks like he might have to have stitches. He definitely needs to have that wound thoroughly cleaned. And he's no longer here today.

"But we have a jury that we swore in and listened to the entire proceedings and we were about to instruct. And so since Mr. Burgener is at the hospital and cannot be here, I wanted to have Mr. Macias represented when we decide what kind of--how we are going to proceed from here.

"And so that's why you are here, Mr. Cline.[15] And so now I don't know if you had an opportunity to talk to [[Petitioner]'s attorney] or [Quinteros's attorney], but I kind of wanted to get an idea of what they think should happen next in their judgment."

At that point, Quinteros's counsel made a motion for mistrial, stating that defendant Macias's conduct in the courtroom involved "the same thing that all three defendants are charged with in this case." [Petitioner]'s attorney stated he was leaning toward a mistrial motion, but first he needed to speak with his client. When Quinteros's attorney pointed out that Macias had been in the courtroom out of the presence of the jury for 30 minutes before he attacked his attorney, the prosecutor responded that Macias attacked Burgener "[o]nly after the jury was brought in[ and] only when the witness took the stand," which suggested Macias slashed his attorney "for the benefit of the jury."

Indicating that the court needed to speak with Macias's attorney to determine whether he wanted to "conflict out," the prosecutor stated that Macias should not benefit from his conduct. The prosecutor suggested Macias would be entitled to a mistrial if Burgener decided he could not continue as Macias's trial counsel because "no one else is ready to represent him at this time." The prosecutor also suggested that the court question the jurors to determine whether they could be fair and that it draft a special jury instruction indicating Macias's conduct could not be used against Quinteros and

---

14    Steve Epperson, a special agent at the Special Service Unit of the California Department of Corrections, had previously testified during the People's case-in-chief. Agent Epperson, who was in the courtroom at the time Macias slashed Burgener with the razor blade, assisted Burgener in the courtroom before he was taken to the hospital.

15    Attorney Stephen Cline made a special appearance on behalf of Macias.

33

[Petitioner].

After further discussion, the prosecutor told the court he was going to "change [his] position," noting that he had consulted with a senior deputy attorney general, and he believed "[Petitioner] and [Quinteros] have a built in reversal issue because of the horrific act done by Macias." The court noted that the jury had witnessed a "slash attack" that was potentially traumatizing and upsetting for them. Stating that "we're asking a lot" of the jurors by asking them to "forget what [they] saw" and deliberate, the court commented that "we're probably going to do the mistrial route as to [[Petitioner] and Quinteros]."

After a recess, [Petitioner]'s attorney indicated that he had conferred with [Petitioner] and that they "wish[ed] to continue on with the trial and finish it up." Quinteros's counsel, however, requested that the court declare a mistrial. Cline, the attorney specially appearing for Macias, stated he thought a mistrial "would be appropriate under the circumstances," but he would "defer to the court." In response, the prosecutor suggested that the court send the jury home to allow the parties to conduct research regarding the issue.

Noting that it also wished to hear from Macias's counsel, Burgener, the court declared a recess.

The court brought the jurors back into the courtroom and gave the following admonishment:

"First of all, I want to apologize for you[r] having to witness what some of you witnessed. And I also want to apologize for the inconvenience of having you all interviewed because an alleged crime occurred in your presence, and so you were witnesses to that alleged crime, so you were interviewed as witnesses.

"Now, I've been doing criminal cases, either as a lawyer or as a judge, for 30 years, and this is the first time something like this has ever happened, and so I think all--and there are countervailing constitutional rights at play here for defendants, for the prosecutor, and so most of us have not experienced something like this either, so I think we all just need to--the lawyers need to all call time out and do a little research and try to figure out how we should proceed.

"So what that means for you, is that we'd like you to return tomorrow morning at 10:00, and we're going to have a little conference between 9:30 and 10:00 with the lawyers, and then we're going to try to figure out what our next step is. So it may

34

be that we're going forward and doing closing argument. It may be that we are declaring a mistrial and you'll all be excused. But before we figure out what the answer to some of those questions are, we need to have a little time to research it. Okay.

"So now this is going to be the hardest part of the next 22 hours, is that *you are not to form or express an opinion about this case*, you're not to discuss it among yourselves or with others, so that's really important, because I know that this incident is going to be on the news, and so if you can avoid watching the news, that would be great. It's also going to be in the paper, so please do not read a newspaper article about it, and please do not discuss it with your loved ones. Just say I can't talk about it until the trial is over.

"And I appreciate your work on this case. We're actually, before this happened, we were making very good progress, and we were going to be doing closing argument, some today and some on Friday.

"So we're actually way, way ahead of schedule. And so, I mean, we still have a little more time to dedicate to this case, like we told you.

"So anyway, so tomorrow morning at 10:00 o'clock in Department 25. Not here. This is our normal department, but that department is a little bit bigger and it accommodates everybody a little better.

"So you're ordered to appear tomorrow morning at 10:00 o'clock outside Department 25. And like I said, I know it's going to be really hard to compartmentalize this, but I'm going to ask you do that. And *if we do go forward with argument and deliberations, that you not let what happened in the courtroom affect what you think the evidence does or does not show about what happened at Donovan*.

"So *what happened at Donovan is what you're charged with deciding, not what happened in our courtroom*. Okay. [¶] Alright. Thank you very much. And you are excused for the day." (Italics added.)

Outside the presence of the jury, attorney Cline represented to the court that Burgener's wound did not appear to be life threatening and he was being evaluated by a plastic surgeon. Cline also stated that Burgener believed he had a conflict with Macias and he could not effectively represent him. The

court then adjourned the hearing to give the parties time to conduct research.

[b]. *The court's in-camera interviews of the jurors and alternate jurors*

The following day, December 14, the prosecution filed an opposition to the defense motion for mistrial. The prosecution urged the court, before deciding whether a mistrial should be declared, to inquire of the jurors whether they could "put the incident aside and decide this case solely on the facts as presented [at] trial and not be influenced by [Macias's] conduct." The prosecution argued that Macias's attack on his attorney warranted his removal from the courtroom and that by his actions he had forfeited his right to appointed counsel if Burgener was unable to continue representing him.

At the follow-up hearing that day, outside the presence of the jury, attorney Burgener told the court he was prepared to go forward with closing arguments on behalf of Macias. In response to the court's inquiry, the prosecutor informed the court that any prosecution of Macias for his courtroom behavior would be handled by the Attorney General's Office. The prosecutor argued that the incident in the courtroom did not necessarily create a conflict between Burgener and Macias and that it was "allowable and appropriate" for Burgener to continue representing Macias.

The trial court then indicated it believed Burgener had an actual conflict with Macias, notwithstanding Burgener's willingness to continue with the trial, and despite the prosecutor's argument to the contrary. Cline, who again was specially appearing on behalf of Macias, told the court he also believed that an actual conflict existed between Burgener and Macias and then represented that Macias did not believe he could work with Burgener. Burgener reiterated that he was "happy to go forward" despite the fact he had received several fine stitches along his jawline.

The court then held an in camera *Marsden*[16] hearing with Macias, Burgener, and Cline to determine whether Burgener should continue representing Macias. Following the hearing, the court relieved Burgener as Macias's counsel. The court also found that Macias had forfeited his right to appointed counsel, indicating that Macias should not benefit from his own wrongdoing. The court appointed Cline as Macias's standby counsel. The court then stated it would conduct an in camera hearing with each individual juror to determine whether he or she could be fair and impartial, and then it would address any mistrial motions by the defendants.

During the in camera hearing, the court, with counsel present,

---

[16]    *People v. Marsden* (1970) 2 Cal. 3d 118.

individually and privately questioned each of the 12 jurors and three alternate jurors outside the presence of the defendants and the other jurors. The court generally asked each juror four questions: (1) whether the juror could put aside what the juror saw, and fairly and impartially evaluate the evidence; (2) whether the juror could not let what the juror saw affect how he or she looked at Quinteros and [Petitioner], given that neither of these defendants was involved in the incident; (3) whether the juror could fairly and impartially set aside what the juror saw with regard to defendant Macias and decide the charges based on what Macias allegedly did on the date of the charged incident; and (4) whether the juror was interviewed by the sheriff.

As pertinent here, jurors Nos. 1, 3, 4, and 7 through 15 indicated that they were able to put aside their observations of the Macias incident and fairly and impartially evaluate the evidence and that the incident would not influence how they viewed the evidence against Quinteros, [Petitioner], and Macias.

Juror No. 2, when asked the first question, stated: "My feeling is yes, but I think if once we adjourn to go through the case, we'll be doing a lot of talking." The court indicated that the conversation should not be about what happened in court between Macias and Burgener, and juror No. 2 replied, "I understand." When the court asked juror No. 2 whether he could abide by an instruction not to consider what had happened in court, he indicated he could do so. Juror No. 2 then indicated he would "certainly try" to not let the incident affect his deliberations with regard to Quinteros and [Petitioner], but indicated that "there's got to be an effect" and noted that he observed "a young man that had a very bad temper." The court asked juror No. 2 whether—as to Macias—he could set aside what happened in court and decide the case on what was said on the witness stand. Juror No. 2 replied, "Yes, we could go through our notes and tally it up and figure what's correct."

Jurors Nos. 5 and 6 indicated they did not believe they could be fair and impartial after observing Macias's conduct. The court excused those jurors and replaced them with alternate jurors.

[i].    *Quinteros's mistrial motion; [Petitioner]'s joinder and motion to sever*

Following the in camera interviews of the jurors, and out of the presence of the jury, Quinteros moved for a mistrial based on the slashing incident in the courtroom. Quinteros's counsel argued that Macias, by cutting his attorney with a razor in the courtroom, painted Quinteros and [Petitioner] in a bad light, although they were not involved in that incident. He also indicated the Macias incident undermined Quinteros's trial defense of

37

downplaying Ortiz's injuries. Quinteros's counsel also argued the jurors could not put the courtroom incident aside even if they said they could.

[Petitioner] and Macias joined Quinteros's mistrial motion. [Petitioner] also moved for severance of his trial.

The court noted that 13 of the 15 jurors interviewed said they could be fair and impartial and could set aside what happened, while the two who said they could not were excused. The court stated it did not see how the Macias incident undercut any argument Quinteros intended to make as to the severity of Ortiz's injuries. The court also noted that both Quinteros and [Petitioner] sat still during the Macias incident, they appeared to be unaware that Macias was going to do what he did to Burgener, and the jurors indicated they would not hold Macias's actions against Quinteros and [Petitioner].

Following further discussion, the court denied the motions for mistrial, reiterating that the jurors indicated they could be fair and impartial and the court had to "take them at their word" and "trust them." The court also denied [Petitioner]'s severance motion.

[c]    *Special jury instructions*

Prior to deliberations, the jury was instructed that it must decide the case based only on the evidence presented in the courtroom. The court also gave the jury the following special limiting instruction:

"Your task is deciding what occurred on July 5th, 2010, at R.J. Donovan state prison. Once you agree . . . on what the facts are in this case, you are to apply the law set forth in these instructions to those facts.

"Ultimately, you will decide whether this case has been proven beyond a reasonable doubt. If it has not been proven beyond a reasonable doubt, you must find the defendants, or any individual defendant against whom the case has not been proven, not guilty.

"*In reaching your determination, you are not to consider anything that you observed, or heard in the courtroom on December 13, 2012. Those events should not enter into or affect your deliberations in any way.*" (Italics added.)

[d].    *Jury deliberations, verdicts, and denial of [Petitioner]'s new trial motion*

After about four and a half hours of deliberations, the jury found [Petitioner] guilty of all three charged offenses (conspiracy to commit murder, attempted murder, and assault with a deadly weapon by a prisoner) and found to be true the gang enhancement allegation attached to each of those three

38

counts.

The jury also found Macias guilty on all three counts.

The jury found Quinteros guilty of assault with a deadly weapon by a prisoner, but found him not guilty of conspiracy to commit murder and attempted murder, and also found the related gang allegations to be not true.

Thereafter, the court denied [Petitioner]'s motion for a new trial.

(ECF No. 16-14 at 27-36 (emphasis in original).)

## 2. Analysis

A criminal defendant has a Sixth Amendment right to an impartial jury where jurors consider only the evidence which is presented to them in open court. *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965) ("The requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."). However, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation . . . . Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

Pursuant to clearly established Supreme Court precedent, "[a] court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances." *Dyer v. Calderon*, 151 F.3d 970, 974 (9th Cir. 1998) (citing 28 U.S.C. § 2254(d)(3)(1994); *Remmer v. United States*, 350 U.S. 377, 379 (1956); *Remmer v. United States*, 347 U.S. 227, 230 (1954)[17]); *see also Godoy v. Spearman*, 861 F.3d 956, 962, 969

---

[17]    *Remmer* provides that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not

(9th Cir. 2017). "An informal in camera hearing may be adequate for this purpose; due process requires only that all parties be represented, and that the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality." *Id*. at 974-75 (citing *Smith*, 455 U.S. at 217; *United States v. Boylan*, 898 F.2d 230, 258 (1st Cir. 1990)). "So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness." *Id*. at 975 (citing *Tinsley v. Borg*, 895 F.2d 520, 526 (9th Cir. 1990)).

Here, the record reflects the trial court complied with Supreme Court precedent by investigating the relevant facts and circumstances of alleged juror bias. In accordance with *Remmer* and *Smith*, as set forth above, a hearing was held to determine whether Petitioner suffered prejudice as a result of the Macias incident. After Petitioner's co-defendants made a motion for mistrial, the trial judge held an *in camera* hearing with counsel present, and "individually and privately questioned each of the 12 jurors and three alternate jurors outside the presence of the defendants and other jurors." (ECF No. 16-14 at 28, 33; *see also* ECF No. 16-8 at 37, 57.) The trial judge generally asked each juror four questions:

> (1) whether the juror could put aside what the juror saw, and fairly and impartially evaluate the evidence; (2) whether the juror could not let what the juror saw affect how he or she looked at Quinteros and [Petitioner], given that neither of these defendants was involved in the incident; (3) whether the juror could fairly and impartially set aside what the juror saw with regard to defendant Macias and decide the charges based on what Macias allegedly did on the date of the charged incident; and (4) whether the juror was interviewed by the sheriff.

(ECF No. 16-14 at 33.)

After two jurors indicated they did not believe they could be fair and impartial after

_____

conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Id*. at 229 (citing *Mattox v. United States*, 146 U.S. 140, 148-50 (1892); *Wheaton v. United States*, 133 F.2d 522, 527 (8th Cir. 1943)).

observing Macias's conduct, the trial judge excused and replaced them with alternate jurors. (*Id*. at 34.) The remaining jurors indicated they could fairly and impartially evaluate the evidence and the incident would not influence how they viewed the evidence against Petitioner and his co-defendants. (*Id*. at 33.) The trial judge found them credible and let them remain on the jury. (ECF No. 16-14 at 33-35; ECF No. 16-8 at 69-71.)

Following the *in camera* questioning of the jurors, all three defendants made a motion for a mistrial, and Petitioner moved for severance of his trial. (ECF No. 16-14 at 34; ECF No. 16-8 at 61-73.) The trial court thereafter permitted defense counsel, outside the presence of the jury, to make arguments in support of their motion. (ECF No. 16-8 at 61-73.) Defense counsel argued that Macias's conduct painted Petitioner and co-defendant Quinteros in a bad light, and that the jurors could not put the courtroom incident aside even if they said they could. (ECF No. 16-8 at 61-73.) The trial court disagreed. (ECF No. 16-14 at 34-35; ECF No. 16-8 at 70-73.) After taking into consideration the prosecution's arguments, the trial court denied the motions for a mistrial and Petitioner's severance motion. (*Id*.)

Subsequently, prior to deliberations, the trial court gave the jury the following special limiting instruction: "In reaching your determination, you are not to consider anything that you observed, or heard in the courtroom on December 13, 2012. Those events should not enter into or affect your deliberations in any way." (ECF No. 16-14 at 35; ECF No. 16-1 at 100.)

Based on the foregoing, the Court finds the Court of Appeal's determination that the trial court did not abuse its discretion in denying Petitioner's motion for mistrial on the issue of juror bias was not contrary to, nor an unreasonable application of, *Remmer* and *Smith*. *See Hedlund v. Ryan*, 854 F.3d 557, 574 (9th Cir. 2017) (citing *Smith*, 455 U.S. at 215) (stating that where the trial judge conducts a hearing to explore the issue of juror bias and the defendant has the opportunity to prove actual bias, "[t]his is the remedy prescribed by the Supreme Court.")

Petitioner challenges the sufficiency of the trial court's impartiality finding as to

Juror No. 2. Petitioner argues that Juror No. 2 admitted he was affected by the attack, and therefore this was evidence of actual bias.[18]  (Pet. at 11-12.)  The trial court's finding that Juror No. 2 was not biased, is a factual finding that is subject to a presumption of correctness on federal habeas review, because "resolution [of the juror impartiality issue] depends heavily on the trial court's appraisal of witness credibility and demeanor."  *See, e.g., Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *Wainwright v. Witt*, 469 U.S. 412, 428-29 (1985); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984); *see also Hedlund*, 854 F.3d at 574 (quoting *Dyer*, 151 F.3d at 975) ("So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness."); *Fields v. Woodford*, 309 F.3d 1095, 1103 (9th Cir. 2002) (the determination of whether a juror is actually biased is a question of fact).

Here, Petitioner has not met his burden of adducing clear and convincing evidence to overcome this presumption.  *See* 28 U.S.C. § 2254(e)(1); *see also Smith*, 455 U.S. at 218 (reiterating Supreme Court law that in § 2254 habeas proceedings the trial judge's findings are presumptively correct and cannot be overcome without clear and convincing evidence). Petitioner simply points to Juror No. 2's statements to the trial judge during the *in camera* hearing as clear and convincing evidence rebutting this presumption.  (Pet at 11-12; Trav. at 18.)  The Court disagrees.

As the Court of Appeal observed, after Juror No. 2 stated that the Macias incident would have "an effect" and observed "a young man that had a very bad temper," he stated he could set aside what happened in court and decide the case on what was said on the witness stand.  (ECF No. 16-14 at 34.)  The trial court found Juror No. 2's statement that he could be fair and impartial to be credible.  (ECF No. 16-14 at 34.)  In addition, although

---

[18]  *See Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007) (defining actual bias as "bias in fact," which is typically found when a prospective juror states that he can not be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view.").

Juror No. 2 stated that the jury would be "doing a lot of talking" about the incident once the jurors adjourned, the trial judge indicated the conversation should not be about what happened between Macias and his counsel, and Juror No. 2 stated he understood. (ECF No. 16-14 at 33.) The trial court was satisfied that no actual bias was present.

An initial equivocal response by a juror does not rebut the presumption the trial court's finding was correct, so long as the juror ends his answer with an unqualified affirmative or negative regarding impartiality, which occurred here. *See Hedlund*, 854 F.3d at 574, n. 11 (citing *United States v. Gonzalez*, 214 F.3d 1109, 1114 (9th Cir. 2000)). Petitioner points to no authority requiring more assurance from Juror No. 2 than an unqualified statement that he could be fair and impartial. *See id.* at 574 & n. 11 (citing *Bashor v. Risley*, 730 F.2d 1228, 1237 (9th Cir. 1984) (no error in keeping juror when juror responded to the question whether she could be impartial with, "Yes, I think I could.")) (finding that petitioner did not rebut the presumption where the juror stated that she "believed" she could be impartial, where the juror did not equivocate, and the trial court "credited her response after asking further questions, observing her demeanor, and judging her credibility").

Petitioner also challenges the Court of Appeal's finding that the jurors who convicted him were not inherently biased. Petitioner contends there was incurable and inherent prejudice caused by the Macias incident, and that even if the jurors stated they could be impartial, it was erroneous to determine they could be under the circumstances. (Pet. at 12.) Petitioner argues that it is "highly unlikely" that any juror could have exercised independent judgment after witnessing Macias's attack on his attorney, even if the juror stated that he or she could. (*Id.* at 10-12.)

Implied bias is "bias conclusively presumed as a matter of law." *United States v. Mitchell*, 568 F.3d 1147, 1151 (9th Cir. 2009) (citing *Gonzalez*, 214 F.3d at 1111). Both the Ninth Circuit and the Supreme Court have presumed bias based on the circumstances in "extraordinary cases." *See Mitchell*, 568 F.3d at 1151; *Dyer*, 151 F.3d at 981 (collecting cases); *Estrada v. Scribner*, 512 F.3d 1227, 1240 (9th Cir. 2008). Implied bias is a mixed

question of law and fact. *Estrada*, 512 F.3d at 1240; *see also Hamilton v. Ayers*, 583 F.3d 1100, 1107 (9th Cir. 2009). "[M]ixed questions of law and fact, including the prejudice determinations in jury misconduct . . . petitions, are generally reviewed under section 2254(d)(1), not section 2254(d)(2)." *Tong Xiong v. Felker*, 681 F.3d 1067, 1074 (9th Cir. 2012).

However, there is no clearly established Supreme Court law regarding the issue of implied bias.[19] *See Hedlund*, 854 F.3d at 575; *Fields*, 309 F.3d at 1104 ("The Supreme Court has never explicitly adopted (or rejected) the doctrine of implied bias."); *see also Garcia v. Sherman*, No. 1:13-cv-00448-SKO HC, 2016 WL 454439, at *8 (E.D. Cal. Feb. 5, 2016) ("Implicit Supreme Court approval and exceptions recognized by the Ninth Circuit are not clearly established Federal law, as determined by the Supreme Court of the United States."). Accordingly, the Court cannot grant habeas relief on Petitioner's implied bias claim. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (where Supreme Court "cases give no clear answer to the question presented, . . . it cannot be said that the state court unreasonably applied clearly established Federal law."); *see also Quinteros v. Paramo*, No. 16-cv-583-JLS (JLB), 2017 WL 1838929, at *6 n.2 (S.D. Cal. May 8, 2017).

Petitioner therefore is not entitled to habeas relief on Ground 2.

## C.  **Habeas Relief is Not Warranted with Respect to Ground 3 of the Petition.**

In Ground 3 of the Petition, Petitioner claims his Sixth and Fourteenth Amendment rights were violated when the trial court refused to declare a mistrial after the jury was prejudiced to believe he was "violent, dangerous, and unpredictable because he was 'shackled' in the same way as his co-defendant [who] 'slashed' his attorney in court, in front of the jury." (Pet. at 13.) Petitioner contends the trial court had a responsibility to

---

[19]   Petitioner cites two circuit cases, *Braswell v. United States*, 200 F.2d 597 (5th Cir. 1952) and *United States v. Mannie*, 509 F.3d 851 (7th Cir. 2007), in support of his implied bias claim. (Pet at. 12.) However, neither case constitutes clearly established federal law under the AEDPA.

hold a hearing to ensure he would not suffer from a prejudiced jury, and to consider an alternative remedy to shackling. (*Id.*) Petitioner further contends that his rights were violated when the trial judge failed to guarantee his right to a fair trial by abdicating decision-making responsibility to security personnel regarding Petitioner's shackling. (*Id.* at 13-14.)

### 1. Background

Based on its independent review of the record, the Court adopts the following factual summary of the shackling incidents from the Court of Appeal opinion as a fair and accurate summary of the underlying facts[20]:

> On December 13, 2012,[21] in the presence of the jury about one minute after Officer Bravo took the witness stand, Macias slashed his attorney's cheek with a small razor. All three defendants were removed from the courtroom before the jury left the courtroom. Later that morning, outside the presence of the jury, the court made a brief record (discussed, *ante*) of the details of Macias's attack on his attorney.
>
> The next morning, December 14, outside the presence of the jury, the court conducted a hearing at which Burgener, who had received what he described as "fine" stitches for his facial wound, informed the court he was prepared to go forward with closing argument on Macias's behalf. In discussing the courtroom attack with the parties' attorneys, the court began by finding that Quinteros was currently serving a 13-year prison sentence, Macias was serving a 26-year prison sentence, and [Petitioner] had a "long prison record."
>
> The court then made the following record—still outside the presence of the jury—pertaining to the use of physical restraints in this case before and

---

[20] The Court notes that Petitioner does not contend the Court of Appeal's recitation of the background facts related to the shackling incidents is inaccurate in any respect. Moreover, Petitioner's discussion of the shackling incidents in his filings before the Court of Appeal and California Supreme Court is not inconsistent with the Court of Appeal's factual summary. (*See* ECF No. 16-12 at 42-48; ECF No. 16-15 at 31-35.)

[21] All further dates are to calendar year 2012.

after Macias's courtroom attack on Burgener:

> "So *during the entire course of the trial*, all—I don't know if we ever put this on the record—*all three defendants have been bolted down with an I-bolt to the floor.* So that means that *they have leg chains on that are strung to an I-bolt that's cemented into the floor* so they can't stand up all the way. But there's a skirt around the table, so *the fact that they're bolted down ... is not apparent to the jury.*

> "And *so that was done because of the fact that they all have long and violent histories, and because two of them are sentenced prisoners*, and so as a precautionary measure, we had them bolted down, although their hands were free.

> "Now that Mr. Macias has attacked Mr. Burgener, I think it's appropriate and necessary to have Mr. Macias chained even in the presence of the jury, with him not have [*sic*] his hands free, although *once the jury comes in, [Petitioner] and [Quinteros] will appear unhandcuffed with their hands not restrained.*

> "And then when Mr. Macias testified, we excused the jury. Mr. Macias got on the stand. He did have leg chains on, but there—it may be apparent to one alternate juror, but not to the other jurors because of the configuration of the witness stand. And then when he was done testifying, we sent the jury out and he came off the stand, so they did not see that he had leg chains on.

> "So I just want to put that on the record, because we had not put that on the record before. *There was no objection from any of the attorneys or the defendants to being chained down, bolted down that way*, so that's the way we proceeded, because *we needed that extra security.* And apparently that was not even good enough to prevent what happened yesterday." (Italics added.)

Later that morning, as already discussed, the court conducted an in camera hearing and individually questioned each of the 12 jurors and three alternate jurors to determine whether they were able to put aside their observations of the Macias's courtroom attack on Burgener and fairly and impartially evaluate the evidence. Although the defense attorneys were present during the hearing, the defendants—Quinteros, Macias, and [Petitioner]—were not present.

Later, at around 12:16 p.m. that same day (December 14), the court conducted a brief hearing at which Quinteros, Macias, [Petitioner], and their

16-cv-02133-WQH (RNB)

counsel appeared in the presence of the jury. At that hearing, which the record shows lasted only a few minutes, the court admonished and excused the jury, directing them to return on December 19. Outside the presence of the jury, the court conducted a hearing on [Petitioner]'s mistrial motion, which Quinteros joined. As discussed, *ante*, the court denied the motion.

At the next hearing, held outside the presence of the jury on December 19, [Petitioner]'s attorney, apparently joined by Quinteros's counsel, renewed the motion for a mistrial, asserting that the jury saw [Petitioner] (and Quinteros) shackled on December 14. The court denied the motion, noting that [Petitioner] and Quinteros were "shackled in front of the jury very briefly," but were no longer shackled and would not be shackled. [Petitioner]'s and Quinteros's attorneys declined the trial court's offer to provide the jury a limiting instruction regarding shackles. The court noted that some of the jurors may have seen the defendants getting unchained from the floor[22] on the day of Macias's courtroom attack on his attorney when they were taken out of the courtroom, but this would have been the first time the jurors became aware that the defendants were restrained. The court further noted that, except for "that one brief hearing" at which [Petitioner]'s and Quinteros's hands were shackled for about five minutes, their hands had never been shackled in court and only Macias continued to be shackled. The court then indicated it intended to instruct the jury that the fact Macias was shackled was not evidence and must be disregarded in deciding the issues of the case.

Shortly thereafter, the jurors were brought back into the courtroom and the court instructed them under CALCRIM No. 204 as follows:

> "[T]he fact that physical restraints have been placed on defendant Eduardo Macias is not evidence. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations."

(ECF No. 16-14 at 42-45 (emphasis in original).)

///

///

---

[22] The court explained that, although the three defendants had been "I-bolted down," there was "a skirt around the table so the jurors [could not] see that."

## 2.    Applicable Federal Law

During the guilt phase of a criminal trial "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial.  Such a determination may . . . take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005); *see also Cox v. Ayers*, 613 F.3d 883, 890 (9th Cir. 2010) ("The appearance of a defendant in shackles before a jury in either the guilt phase or the penalty phase of a trial may constitute a violation of the defendant's right to due process.").

The Supreme Court has recognized that the shackling of defendants in front of the jury during the guilt phase "undermines the presumption of innocence and the related fairness of the factfinding process," "diminishes" the accused's ability to community with his lawyer, and "affront[s] the dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Deck*, 544 U.S. at 630-32 (citations omitted).  Therefore, although it acknowledges there will be cases "where these perils of shackling are unavoidable," . . . "given their prejudicial effect, due process does not permit the use of visible restraints if the *trial court* has not taken account of the circumstances of the particular case." *Id*. at 632 (emphasis added); *see also Larson v. Palmateer*, 515 F.3d 1057, 1063 (9th Cir. 2008) (noting the Supreme Court in *Deck* specifically rejected "post-hoc rationales" for imposing security restraints; and finding that the petitioner's "due process rights were violated when the trial court failed to make a finding on the record justifying the necessity of physical restraints, and that the absence of such a finding cannot be cured by the reviewing court's after-the-fact justifications.)

## 3.    Analysis

In order to demonstrate that his shackling at trial amounted to a constitutional violation, Petitioner must demonstrate: (1) that he was physically restrained in the presence

16-cv-02133-WQH (RNB)

of the jury, (2) that the shackling was seen by the jury, (3) that the physical restraint was not justified by state interests, and (4) that he suffered prejudice as a result. *See Cox*, 613 F.3d at 890 (citing *Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir. 2002)). In the context of a habeas proceeding, the use of physical restraints visible to the jury prejudices a defendant if it "had substantial and injurious effect or influence in determining the jury's verdict." *Cox*, 613 F.3d at 891 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)); *see also Elmore v. Sinclair*, 799 F.3d 1238, 1247 (9th Cir. 2015); *Ghent*, 279 F.3d at 1132 n.9.

Here, with respect to the first prong, the record reflects that on December 14, 2012, Petitioner and his co-defendants were shackled in front of the jury for a brief period of time when the trial judge excused the jury for the weekend just prior to closing arguments. (*See* ECF No. 16-8 at 51-52; 60-61; ECF No. 16-9 at 7-8.) With respect to the second prong, the record reflects that at least some members of the jury witnessed, or were exposed to, Petitioner and his co-defendants being unbolted from the floor as defendants were removed from the courtroom after the Macias incident. (*See* ECF No. 16-8 at 51-52; ECF No. 16-9 at 7-8.)

With respect to the third prong, the record reflects that prior to Petitioner appearing before the jury in shackles, the trial court made no determination that the use of physical restraints *visible to the jury* was justified by a state interest specific to the trial. In fact, the trial court made the opposite determination, by making a finding prior to trial that Petitioner's leg shackles should be concealed from the jury, and that he should not appear in front of the jury in handcuffs. (*See* ECF No. 16-8 at 51.) Even after the Macias incident, the trial court made the explicit determination that Petitioner should appear without handcuffs in front of the jury. (*See id.*)

When Petitioner moved for a mistrial on the basis that he appeared briefly in front of the jury in shackles, the trial court *still* did not make any attempt to determine that the shackles were required by a state interest specific to the trial. (ECF No. 16-9 at 7.) Rather, the trial judge, in denying Petitioner's motion for a mistrial, stated:

THE COURT: And I'm going to deny that.

Both Mr. Quinteros and [Petitioner] were shackled in front of the jury very briefly, and I don't think that – he's not going to be shackled now, and neither Mr. Quinteros nor [Petitioner]. And if you want me to do a limiting instruction, I'm happy to do a limiting instruction, saying that if they were shackled up on that day, you're not to consider that in your deliberations.

. . .

They've been I-bolted down, as we said earlier, but there's a skirt around the table so the jurors can't see that.

Now, the jurors did see them get un I-bolted on Thursday, the 13th, when we were taking them out, because we made the jurors and everybody stay here, and we took the defendants out first, so maybe some of the jurors may have seen their – them getting unchained from the ground, but that would have been – from the floor, but that would have been the first time that the jurors would have been aware of that.

And then they have never been shackled. Their hands have never been shackled in court before, but for that one brief hearing, which lasted about five minutes, their hands were shackled. That's true. But they are not shackled now. Only Mr. Macias is shackled, but I have an instruction that talks about that, too.

[Petitioner's Counsel]: Well, I rather not do the instruction, your Honor. I think that it will bring more attention to it.

(*Id*. at 7-8.) Thus, at no time did the trial court make a determination that Petitioner's visible shackling in front of the jury was justified by an essential state interest.

On appeal, the Court of Appeal did not dispute that Petitioner appeared in front of the jury in shackles without a prior determination that such an appearance was justified. (*See* ECF No. 16-14 at 42-45, 49-50.). Rather, the Court of Appeal concluded that there was a "manifest need" for courtroom security personnel to act as they did immediately after the Macias incident, and that "the [trial] court's decision to allow the jury to 'very briefly' see [Petitioner] and his codefendants with their hands restrained the next morning was

50

similarly justified."[23] (*See id*. at 49-50.) In addition, after noting Petitioner only appeared in shackles before the jury for a few minutes, and that this was the only time Petitioner was shackled in front of the jury, the Court of Appeal concluded that because "prejudicial error does not occur simply because the defendant was seen in shackles for only a brief period inside the courtroom by one or more jurors, . . . the [trial] court did not prejudicially abuse its discretion or violate [Petitioner's] federal constitutional due process right to a fair trial by an impartial jury." (*Id.* at 50.)

On collateral review, a federal court may not overturn the state court's decision unless it applied its harmless error standard in an "objectively unreasonable" manner. *Davis v. Ayala*, 135 S.Ct. 2187, 2198-99 (2017) (citing *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003)); *see also Fry v. Pliler*, 551 U.S. 112, 119 (2007) (a "federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable"). A state court decision is not unreasonable if fairminded jurists could disagree on its correctness. *Id*. at 2199 (internal quotations omitted) (citing *Richter*, 562 U.S. at 101). Petitioner must therefore show that the state court's decision to reject his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. (citing *Richter*, 562 U.S. at 103).

In determining whether visible physical restraints prejudiced a defendant, the Ninth Circuit has "considered the appearance and visibility of the restraining device, the nature of the crime with which the defendant was charged and the strength of the state's evidence against the defendant." *Larson*, 515 F.3d at 1064 (citing *Dyas v. Poole*, 317 F.3d 934, 937

---

[23]     Under the authorities cited above, the Court of Appeal's failure to recognize the trial court's error in allowing the shackling without a prior determination of the necessity for visible restraints arguably was an unreasonable application of *Deck*. However, for the reasons discussed herein, Petitioner still is not entitled to habeas relief on this claim because the Court of Appeal reasonably concluded there was no prejudicial error.

(9th Cir. 2003)). "'[T]he greater the intensity of shackling . . . the greater the extent of prejudice,' because elaborate physical restraints are more likely to create the appearance of the defendant's dangerousness." *Id.* (quoting *Spain v. Rushen*, 883 F.2d 712, 722 (9th Cir. 1989)). "Hence, physical restraints such as a waist chain, leg irons or handcuffs may create a more prejudicial appearance than more unobtrusive forms of restraint." *Id.* (citing *Spain*, 883 F.2d at 722). In addition, if the defendant is charged with a violent crime, then the risk of prejudice increases, because shackling "essentially brand[s][him] as having a violent nature." *Rhoden v. Rowland*, 172 F.3d 633, 637 (9th Cir. 1999). Concerns about prejudice may be mitigated, however, if the state's evidence against the defendant was "overwhelming," or if the shackling is only for a brief period of time. *See Dyas*, 317 F.3d at 937; *Elmore*, 799 at 1248; *see also Cox*, 613 F.3d at 891 ("[W]e have held that the unconstitutional shackling of a defendant results in prejudice only if the evidence of guilt is not 'overwhelming.'").

Here, Petitioner's hands appeared shackled before the jury for a very brief period of time, only minutes, after his co-defendant slashed his own counsel. (*See* ECF No. 16-2 at 98.) Otherwise, his hands were not shackled throughout the trial. In addition, although the jurors were exposed to Petitioner being unbolted from the floor after the Macias incident, it is unclear the extent to which the jurors saw or were even aware of the fact given all that was going on. The trial court and the defendants also made the decision not to raise or instruct the jury on the issue so as not to bring attention to it. Taken together, the Court finds these factors weigh against a finding of prejudice.

Weighing in favor of a finding of prejudice is the fact Petitioner was charged with conspiracy to commit murder, attempted murder, and assault by means likely to cause great bodily harm, which are violent crimes. Petitioner argues the shackling eroded his presumption of innocence because it suggested to the jury that he is a dangerous person who must be separated from society. (Trav. at 22.) Mitigating this impact, however, is the fact the jury was fully aware Petitioner had been in prison, was a validated member of the Mexican Mafia, and was on trial for attempted murder *while in prison*. Thus, the fact that

Petitioner was restrained, though not visibly, during trial, and briefly shackled as the trial court sorted through the Macias incident, could easily be viewed as a practical security measure given Petitioner's history rather than an indication of guilt.

In addition, although the Court does not necessarily find that the state's evidence against Petitioner was overwhelming on all counts, there was substantial evidence against Petitioner, and the jury only deliberated for the afternoon before coming back and finding Petitioner guilty on all counts. (*See* ECF No. 16-2 at 103-04; ECF No. 16-9 at 199-200.) Lastly, as noted by the Court of Appeal, the jury found Quinteros not guilty on two counts, even though the jury also saw Quinteros shackled and bolted to the floor during the trial. This supports the conclusion that the jurors remained impartial and the outcome was not influenced by Petitioner's appearance in shackles.

Based on the foregoing, this Court finds the Court of Appeal did not apply its harmless error standard in an objectively unreasonable manner when it determined there was no prejudicial error. Moreover, the Court does not have "grave doubt" that Petitioner's brief appearance wearing shackles and leg restraints in front of the jury had a "substantial and injurious effect or influence in determining the jury's verdict." *See Davis*, 135 S.Ct. at 2197-98 (citing *Brecht*, 507 U.S. at 637; *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)) ("In a collateral proceeding . . . relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.")

Accordingly, Petitioner is not entitled to habeas relief on Ground 3.

### C. Habeas Relief is Not Warranted with Respect to Petitioner's Cumulative Error Claim.

Petitioner appears to assert a cumulative error claim in his Petition. (*See* Pet. at 13-14.) As Respondent points out, Petitioner never presented this claim to the California Supreme Court for consideration, and therefore, it is not exhausted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full

opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."). However, without waiving this argument, Respondent asserts the claim should be rejected as meritless. (ECF No. 15-1 at 25-26.)

The AEDPA requires a petitioner to "exhaust[] the remedies available in the courts of the State" before he may obtain federal habeas relief. *See* 28 U.S.C. § 2254(b)(1)(A); *Alfaro v. Johnson*, 862 F.3d 1176, 1180 (9th Cir. 2017). The exhaustion requirement is rooted in the principle of comity, and "reduces friction between the state and federal court systems by avoiding the unseemliness of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance." *O'Sullivan*, 526 U.S. at 845 (internal alterations and quotation marks omitted). Nevertheless, a habeas petitioner may be excused from exhausting a given claim where (1) "there is an absence of available State corrective process," or (2) "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(i)-(ii). Neither of these exceptions to AEDPA's exhaustion requirement applies in this case.

"[A] district court is permitted to stay a mixed petition—a petition containing both exhausted and unexhausted claims—in 'limited circumstances,' so that a petitioner may present his unexhausted claims to the state court without losing his right to federal habeas review due to the relevant one-year statute of limitations." *Wooten v. Kirkland*, 540 F.3d 1019, 1023 (9th Cir. 2008) (citing *Rhines v. Weber*, 544 U.S. 269, 273-75, 277-78 (2005)). However, "a district court must stay a mixed petition only if: (1) the petitioner has 'good cause' for his failure to exhaust his claims in state court; (2) the unexhausted claims are potentially meritorious; and (3) there is no indication that the petitioner intentionally engaged in dilatory litigation tactics." *Id.* (citing *Rhines*, 544 U.S. at 278).

The Court finds that Petitioner has not established good cause for his failure to exhaust his cumulative error claim in state court. Moreover, it is unclear whether Petitioner intends to assert this claim. In his Petition, Petitioner does not separate out this claim, and in his Traverse, he does not address it at all. As such, the Court need not address the

remaining two factors.  *See Wooten*, 540 F.3d at 1023.

Regardless, the Court finds Petitioner is not entitled to habeas relief on a cumulative error theory.  The Supreme Court recognizes the possibility that the combined effect of discrete trial errors, when none of them individually warrants relief, can be found to have had a substantial and injurious effect on the jury's verdict.  *See Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) ("The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair."); *Phillips v. Woodford*, 267 F.3d 966, 985-86 (9th Cir. 2001) ("We consider the cumulative prejudicial effect of multiple trial errors in determining whether relief is warranted."), citing *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (per curiam) (holding "significant errors occurred that, considered cumulatively, compel affirmance of the district court's grant of habeas corpus," citing Circuit cases recognizing the cumulative impact of multiple deficiencies); *see also Alcala v. Woodford*, 334 F.3d 862, 882-83 (9th Cir. 2003) (holding "district court did not err in finding that the combined prejudice of the multiple errors committed in this case deprived [petitioner] of a fundamentally fair trial and constitutes a separate and independent basis for granting his petition.").

Because the only possible trial court error in this case was the trial court's failure to make a prior determination of the need for visible shackling, there was no prejudice here to accumulate.  *See, e.g.*, *Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004); *Karis v. Calderon*, 283 F.3d 1117, 1132 (9th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003); *see also Jones v. Stotts*, 59 F.3d 143, 147 (10th Cir. 1995) (noting that cumulative-error analysis evaluates only effect of matters determined to be error, not cumulative effect of non-errors). "One error is not cumulative error."  *United States v. Sager*, 227 F.3d 1138, 1149 (9th Cir. 2000).  Therefore, this Court finds Petitioner cannot satisfy the standards for habeas relief based on a theory of cumulative error.  Petitioner has not established that two or more substantial errors occurred in his case which, considered in combination, could overcome their failures individually to satisfy the substantial and injurious effect on the outcome of

his trial standard. *See Parle*, 505 F.3d. at 927.

## RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the District Judge issue an Order (1) approving and adopting this Report and Recommendation; and (2) directing that judgment be entered denying the Petition and dismissing this action with prejudice.

Any party having objections to the Court's proposed findings and recommendations shall serve and file specific written objections within **fourteen (14) days** after being served with a copy of this Report and Recommendation. *See* Fed. R. Civ. P. 72(b)(2). The objections should be captioned "Objections to Report and Recommendation." A party may respond to the other party's objections within **fourteen (14) days** after being served with a copy of the objections. *See id*. The failure to object within the time limit specified shall be deemed a consent to any proposed findings of fact.

The parties are advised that Rule 11 provides that in habeas corpus matters pursuant to 28 U.S.C. § 2254, the District Judge must issue or deny a Certificate of Appealability when a final order adverse to the applicant is entered. The parties may wish to take this Rule into consideration at the time they file any Objections to the Report and Recommendation.

The Report and Recommendation of a Magistrate Judge is not a final appealable order. Any Notice of Appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1) should not be filed until entry of a judgment and/or order by the District Judge.

IT IS SO ORDERED.

Dated: April 30, 2018

_____
HON. ROBERT N. BLOCK
United States Magistrate Judge